USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __3/21/2016__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
J.M. and N.M., individually and on behalf of L.M., :
a minor,                                                                      :
                                                                                  :
                                               Plaintiffs,    :                    15-CV-353 (VEC)
                                                                                  :
                          -against-                            :                    OPINION & ORDER
                                                                                  :
THE NEW YORK CITY DEPARTMENT OF      :
EDUCATION,                                                       :
                                                                                  :
                                               Defendant.   :
-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

This case is brought under the Individuals with Disabilities in Education Act ("IDEA"),

20 U.S.C. § 1400 *et seq.*, by parents, J.M. and N.M., and their child, L.M., seeking

reimbursement from the New York City Department of Education ("DOE") for private school

tuition.  As this Court has expressed previously, the Court's heart goes out to the parents, who

understandably want what is best for their child.  But the law guarantees children with

disabilities only a free and appropriate public education ("FAPE"), not the best education money

can buy.  It was the parents' prerogative to enroll L.M. in private school, but because the

Department of Education ("DOE") offered L.M. a FAPE, their claim for tuition reimbursement is

DENIED.

**BACKGROUND**[1]

**I.    L.M.'s Background**

Plaintiffs seek tuition reimbursement for the 2011-12 school year, during which L.M. was

enrolled at the Rebecca School ("Rebecca").  Tr. 238.  L.M. has been diagnosed with Pervasive

---

[1]          The Court assumes that any reader of this opinion is familiar with this area of the law but will, nevertheless,
offer the customary apology that this opinion is—like the briefs and the other opinions cited herein—"replete with
acronyms."  *M.H. v. N.Y. City Dep't of Educ.*, 685 F.3d 217, 223 n.1 (2d Cir. 2012).  A glossary of IDEA acronyms

Developmental Disorder and was classified by the DOE as a student with Autism during the relevant time period.  Def. Ex. 3 at 13.  L.M. was fourteen years old at the beginning of the 2011-12 school year.  IHO Decision at 9; Def. Ex. 3.[2]

Plaintiffs' pursuit of reimbursement was previously heard by this Court in *J.M. and N.M. v. N.Y. City Dep't of Educ.*, 12 CV 8504 (KPF).  Judge Failla granted the DOE's motion for summary judgment, denied Plaintiffs' motion for summary judgment and remanded the case to the Independent Hearing Officer ("IHO") for consideration of claims raised in the Plaintiffs' due process complaint ("DPC") that the IHO had not previously addressed.  Familiarity with that opinion is presumed, and Judge Failla's excellent recitation of the facts will not be repeated here.  The facts discussed here are the ones that are relevant to the two remaining issues before this Court.

## II.    The Committee on Special Education's 2011-2012 IEP

In developing L.M.'s IEP for the 2011-2012 year, the Committee on Special Education ("CSE") team discussed, *inter alia*, L.M.'s annual goals, short-term objectives, and a post-secondary transition plan.  Tr. 38, 44-45, 64-65, 72; Def. Ex. 7.  In particular, L.M.'s social

---

is attached as an appendix.  Moreover, because familiarity with the subject matter is presumed, this opinion will also dispense with the customary recitation of the statutory framework that applies.

[2]      Defendant filed under seal a copy of the official administrative record from the New York State Education Department Office of State Review.  Unless otherwise specified, the exhibits cited herein are from the evidence admitted at the underlying impartial hearings before the impartial hearing officer ("IHO").  Plaintiffs' exhibits are marked with letters and DOE's exhibits are marked with numbers.  Citations to the impartial hearing transcript are marked "Tr. --."  The Court cites to the March 6, 2012 Findings of Fact and Decision of IHO Rona Feinberg, Esq., as "First IHO Decision" and the October 24, 2012 Decision of the State Review Officer ("SRO"), Decision No. 12-079, as "First SRO Decision."  The Court cites to the March 20, 2014 Findings of Fact and Decision of IHO Feinberg as "Second IHO Decision" and the December 12, 2014 Decision of SRO Justyn P. Bates, Decision No. 14-055, as "Second SRO Decision."  The Court further cites to the Opinion entered by Judge Failla on Plaintiffs' previously filed complaint in the related case, *J.M. v. N.Y. City Dep't of Educ.*, No. 12 Civ. 8504(KPF), 2013 WL 5951436 (S.D.N.Y.  Nov. 7, 2013) as "*J.M. I*."

The Court refers to the parties' briefing on their cross-motions for summary judgment as "Pls. Mem.," "Def. Mem.," "Pls. Reply," and "Def. Reply."

worker from Rebecca "assisted the group in developing the 'daily living skill goals' and other goals" component of the IEP." *J.M. I*, 2013 WL 5951436, at \*4 (citing Tr. 25:10–26:8). The members of the CSE team, including Plaintiffs, came to a consensus that L.M. would not seek higher education, but her parents hoped that she might be able to marry and raise a family and acknowledged that she may also wish to seek employment. Tr. 69-71.

In addition to requiring speech-language therapy, occupational therapy and counseling, the IEP included 14 annual goals and short terms objectives to address L.M.'s needs, which included improving skills associated with activities of daily living ("ADL") (such as "creat[ing] and manag[ing] a budget," and "learn[ing] to travel independently and safely") and developing or improving coping strategies for when she was "dysregulated." Def. Ex. 3 at 6-12.

The IEP additionally contained a "transition plan" that consisted of four "long-term adult outcomes" to address community integration, post-secondary placement, independent living, and employment. *Id.* at 16. The transition plan provided that: (1) L.M. would integrate into the community independently; (2) Vocational and Educational Services for Individuals with Disabilities ("VESID") services would be explored; (3) L.M. would live independently; and (4) L.M. would seek employment in an area of her interest. *Id.* The IEP did not include additional transition services or activities that were specifically tied to the transition plan, and the IEP did not require a functional vocational assessment. *Id.*; Tr. 45. The IEP also did not fully incorporate the transition meeting notes or educational activities included in L.M.'s December 2010 progress report from Rebecca. *Compare* Def. Ex. 3 at 16 *with* Def. Ex. 12 at 4-5. Nevertheless, after the IEP was completed, the members of the CSE team, including L.M.'s parents, agreed that the plan was appropriate for the 2011-12 school year. Def. Ex. 7 at 1.

### III.   Placement at the Hungerford School

On June 6, 2011, the DOE sent Plaintiffs a Final Notice of Recommendation ("FNR")

placing L.M. at P721R@PB43R a/k/a the Hungerford School ("Hungerford"), a public school

located in Staten Island.  Def. Ex. 13.  J.M. toured Hungerford with a special education advocate

and Hungerford's Assistant Principal, Linsey Miller, on June 27, 2011.  Pl. Ex. C; Tr. 102-104,

408.  During the course of the tour, Ms. Miller showed J.M. the special wing of the school and

the special area of the cafeteria that were dedicated to Hungerford students.  Tr. 103-04.  Ms.

Miller also showed J.M. a private dining room that could be used by Hungerford students.  *Id.* at

103.

The next day, J.M. informed the CSE that Plaintiffs were rejecting Hungerford, would

unilaterally re-enroll L.M. at Rebecca and would seek tuition reimbursement.  Pl. Ex. C; Tr. 408-

409.  Among other concerns, J.M. noted, as relevant here, that "[t]he school building is very

large and there are over 1500 students.[3]  [L.M.] would easily be overwhelmed," and "The

special education students eat lunch with the general education students.  There are

approximately 100 students in the cafeteria during lunch.  The noise level and commotion would

make [L.M.] anxious."  Pl. Ex. C.  L.M. did re-enroll at Rebecca for the 2011-2012 school year,

Tr. 238-39, and Plaintiffs are now seeking tuition reimbursement.

### IV.   Prior District Court Decision

On July 11, 2011, Plaintiffs filed a due process challenge ("DPC") raising various

procedural and substantive challenges to the 2011-12 IEP and the DOE's placement of L.M. at

Hungerford.  Pl. Ex. A.  As relevant here, Plaintiffs argued that the IEP's transition plan was

incomplete, and therefore inadequate, and further that the large number of students in the school

---

[3]     Hungerford is one of four schools within a single building.  J.M.'s reference to 1500 students is his estimate
of the total number of students who attend school in the building, not to the number of Hungerford students.

building and the noisy environment of the cafeteria would be overwhelming and inappropriate for L.M.'s auditory sensitivities. *Id.*

Evidentiary hearings on Plaintiffs' DPC were held before the IHO in late 2011 and early 2012. First IHO Decision at 2. Ms. Miller testified that Hungerford had approximately 60 students, and it shared a building with three schools for typically-developing students. Tr. 96-97. In total, approximately 1,150 students attended school in the building that Hungerford shared. *Id.* at 98, 127-28. While Hungerford shared a cafeteria and library with the other schools, its students attended classes in their own wing of the school, and because their classes were on different schedules, they did not pass other students in the hallways or hear school bells from the other schools. *Id.* at 97, 100. Hungerford students also ate breakfast (which included an instructional time focusing on social skills) and lunch in a separated area of the cafeteria, *id.* at 100-01, 128-29, 207-08, and had access to a private dining room if they could not tolerate the noise level of the cafeteria, *id.* at 101, 129, 208; Pls. Mem. at 16.

The IHO issued its initial decision on March 6, 2012, finding that the IEP was inappropriate for reasons unrelated to Hungerford's size and noise level, and therefore declined to address those and other arguments. First IHO Decision at 33-39. Defendant appealed, and the SRO reversed, finding that the IEP was appropriate and that DOE had provided L.M. with a FAPE for the 2011-2012 school year. Pls. Mem. at 4-5; *see also J.M. I*, 2013 WL 5951436, at *10-13. Plaintiffs appealed to this Court, and Judge Failla upheld the SRO's decision, finding, *inter alia*, that "the 2011-12 IEP was reasonably calculated to enable L.M. to receive educational benefits," *J.M. I*, 2013 WL 5951436, at *17, and that "the Hungerford School was capable of implementing the 2011-12 IEP in July, had the Parents accepted that placement," *id.* (citing Tr. 108:7-112:18). Nonetheless, Judge Failla remanded the case to the IHO for findings of fact and

conclusions of law on other issues that had been raised by Plaintiffs but not addressed in either the IHO's or the SRO's initial decisions.  *Id.* at *21-22.

## V.  Administrative Proceedings Following the Prior District Court Decision

### A.  The Impartial Hearing

The impartial hearing continued before the IHO in early 2014, Tr. 432-504, and on March 20, 2014, the IHO issued a second decision.  *See* Second IHO Decision.  No additional testimony was taken, but both parties presented their closing briefs and clarified their understanding of the remaining challenges at issue.  Tr. 432-504; Pl. Exs. I, J; Def. Exs. 23, 24.

### B.  The IHO Decision

The IHO's second decision concluded that the DOE had not offered L.M. a FAPE and again ordered tuition reimbursement.  Second IHO Decision at 16-17.  While dismissing certain challenges that Plaintiffs had failed to raise in their DPC as procedurally improper and dismissing others on the merits, the IHO found two grounds for awarding tuition reimbursement. *Id.* at 6-16.  First, the IHO found that the transition plan included in L.M.'s 2011-12 IEP was "fatally vague" and therefore non-compliant with applicable state education regulations.  *Id.* at 8-10.[4]  Second, the IHO rejected some of Plaintiffs' objections to the Hungerford placement, *id.* at 8-16, but nonetheless found that Hungerford was not an appropriate placement for L.M. because (1) it was too large; (2) the school bells and cafeteria noise would not be appropriate given L.M.'s auditory sensitivity; and (3) if L.M. opted to eat in the "private" cafeteria, she would miss out on valuable socialization time, *id.* at 12-16.

---

[4]  State regulations require IEPs for students who are fifteen years old or older to include a detailed "transition plan" for the student's anticipated departure from school.  8 NYCRR § 200.4(d)(2)(ix).

C.      **The SRO Decision**

DOE appealed and the SRO, once again, reversed the IHO, finding that the DOE had offered L.M. a FAPE for the 2011-12 school year.[5]  Second SRO Decision at 9-10.  First, the SRO reversed the IHO's finding that L.M. was denied a FAPE based on an inadequate transition plan.  *Id.* at 6-8.  The SRO agreed that L.M.'s IEP was required to include "appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, if appropriate, independent living skills, as well as transition services needed to assist the student in reaching those goals," *id.* at 6-7 (citing 20 U.S.C. § 1414(d)(1)(A)(i)(VIII); 34 CFR 300.320(b); 8 NYCRR 200.4(d)(2)(ix)), and agreed that the IEP was noncompliant because it failed to specify "the activities needed to facilitate the student's movement from school to post-school activities," including, *inter alia*,  the development of employment skills and the acquisition of skills related to ADL, Second SRO Decision at 7 (citing Def. Ex. 3 at 16).  Nonetheless, the SRO concluded that because the IEP contained annual goals and short-term objectives that were "directly related to the information the CSE had before it at the time the transition plan was developed" and that were crafted "to assist L.M. in achieving her post-school activities," Second SRO Decision at 7, taken as a whole, the IEP did not deprive L.M. of a FAPE, *id.* at 8.

With respect to Plaintiffs' challenges to L.M.'s placement at Hungerford, the SRO found that Plaintiffs' challenges based, *inter alia*, on L.M.'s auditory sensitivities were impermissibly speculative because L.M. never actually enrolled at Hungerford.  Second SRO Decision at 8 (citing *R.E. v. N.Y. City Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012)).  The SRO nonetheless reviewed the record and concluded that, even if Plaintiffs' challenges were not speculative,

---

[5]      Plaintiffs did not appeal the IHO's dismissal of their remaining challenges.  Having thereby waived any right to appeal the IHO's findings with respect to those challenges, the Court does not address them here.

neither the evidence nor the IHO's analysis supported the conclusion that the Hungerford placement resulted in the denial of a FAPE.  *Id.* at 9 ("[T]he evidence . . . does not support the conclusion that the district would have violated the FAPE legal standard related to IEP implementation; that is, that the district would have deviated from the student's IEP in a material or substantial way." (citing cases)).  Because the SRO concluded that DOE had provided L.M. a FAPE, it did not consider whether Rebecca School was an appropriate placement for L.M. or whether equitable considerations supported the Plaintiffs' claims.

Plaintiffs subsequently initiated the present action, seeking reversal of the Second SRO Decision and requesting that the IHO's decision be reinstated, including with respect to tuition reimbursement.  Dkt. 1.  Now pending before the Court are the parties Cross-Motions for Summary Judgment.[6]

## DISCUSSION

### I.  Standard of Review

"In considering an IDEA claim, a district court 'must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence.'"  *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 837-38 (2d Cir. 2014) (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007)).  In undertaking this independent review, courts are "restrained by our lack of specialized knowledge and educational expertise; we must defer to the administrative decision particularly where the

---

[6]      Summary judgment, which is the preferred vehicle for determining IDEA cases, functions differently in the IDEA context.  *See T.Y. v. N.Y. City Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009).  "[A] motion for summary judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact.  Rather, the motion serves as a pragmatic procedural mechanism for reviewing a state's compliance with the procedures set forth in IDEA."  *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) (internal quotations omitted).  Although styled as a motion for summary judgment, the procedure, in substance, is an appeal from an administrative determination.  *C.U. v. N.Y. City Dep't of Educ.*, 23 F. Supp. 3d 210, 222 (S.D.N.Y. 2014) (citing *Lillbask*, 397 F.3d at 83 n.3).

state officer's review has been thorough and careful." *M.W. ex rel. S.W. v. N.Y. City Dep't of Educ.*, 725 F.3d 131, 138-39 (2d Cir. 2013) (internal quotations and alteration omitted); *see also M.O. v. N.Y. City Dep't of Educ.*, 793 F.3d 236, 243 (2d Cir. 2015) ("While the district court must base its decision on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." (citation and internal quotations omitted)).

Two factors guide the level of deference owed to the administrative opinions: "the quality of the [administrative] opinion and the court's institutional competence." *C.F. ex rel. R.F. v. N.Y. City Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014) (citation omitted). To determine whether the SRO's review has been appropriately thorough and careful, "courts must look to the factors that normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *M.W.*, 725 F.3d at 139 (internal quotations omitted); *M.O.*, 793 F.3d at 243 ("Deference is particularly appropriate when the state officer's review 'has been thorough and careful,' but still we do not 'simply rubber stamp administrative decisions.'" (quoting *R.E.*, 694 F.3d at 184)). The "institutional competence" question hinges on whether a matter involves "'persistent and difficult questions of educational policy,'" *C.L.*, 744 F.3d at 838 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 208 (1982)), or "'issues of law,' such as 'the proper interpretation of the federal statute and its requirements,'" *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 82 (2d Cir. 2005) (quoting *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1122 (2d Cir. 1997) (alteration omitted)). "[A]s a general matter, when an IHO and SRO reach conflicting conclusions, [courts should] defer to the final

decision of the state authorities, that is, the SRO's decision" unless the SRO's decision "is

insufficiently reasoned to merit that deference and the IHO's decision is more thorough and

carefully considered . . . ." *C.L.*, 744 F.3d at 838 (citations, internal quotations and alterations

omitted).

## II.     *Burlington/Carter* Test

A parent who is dissatisfied with a school district's proposed placement for his or her

disabled child may enroll the child in private school and then seek tuition reimbursement from

the state.  "Parents who unilaterally place their child in a private school do so 'at their financial

risk.'"  *M.O.*, 793 F.3d at 243 (quoting *Reyes ex rel. R.P. v. N.Y. City Dep't of Educ.*, 760 F.3d

211, 215 (2d Cir. 2014)).[7]  Whether the parent's request for reimbursement will be successful is

determined by the so-called *Burlington/Carter* test, "which looks to (1) whether the school

district's proposed plan will provide the child with a free appropriate public education; (2)

whether the parents' private placement is appropriate to the child's needs; and (3) a consideration

of the equities."  *C.F.*, 746 F.3d at 73; *see also T.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145,

152 (2d Cir. 2014) (citing *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15-16 (1993)).

Prong one of the *Burlington/Carter* test requires the DOE to establish that the IEP was

appropriate, *i.e.*, that it would actually provide a FAPE.  *M.W.*, 725 F.3d at 135.  "Under New

York's Education Law § 4404(1)(c), the local school board bears the initial burden of

establishing the validity of its plan at a due process hearing."  *M.O.*, 793 F.3d at 243 (internal

quotation and citation omitted).  The first prong of *Burlington/Carter* involves "a two-part

inquiry that is, first, procedural, and second, substantive."  *M.W.*, 725 F.3d at 139 (internal

---

[7]     The risk is not insignificant.  Tuition at the Rebecca School for the 2011-12 school year, according to Plaintiffs, was $ 86,655.00.  By way of comparison, tuition at The Spence School (a private girls school in Manhattan) was $45,150, tuition at Collegiate (a private boys school in Manhattan) was $45,400, and tuition at Harvard College was $45,278 for the 2015-16 school year.

quotation an citation omitted).  Challenges based on procedural violations "only entitle parents to reimbursement if they 'impeded the child's right to a free appropriate public education,' 'significantly impeded the parents' opportunity to participate in the decisionmaking process,' or 'caused a deprivation of educational benefits.'"  *C.F.*, 746 F.3d at 78-79 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)).  Nevertheless, the procedural inquiry "is no mere formality, as adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP."  *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252-53 (2d Cir. 2009) (*per curiam*) (internal quotation marks and citations omitted).

Relative to the substantive validity under *Burlington/Carter*, the test asks "whether [the IEP] was 'reasonably calculated to enable the child to receive educational benefits.'"  *T.M.*, 752 F.3d at 160 (quoting *Rowley*, 458 U.S. at 207).  An IEP is substantively adequate if the IEP is "likely to produce progress, not regression, and [if the IEP] affords the student with an opportunity greater than mere trivial advancement.  However, it need not furnish every special service necessary to maximize each handicapped child's potential."  *M.O.*, 793 F.3d at 239 (internal quotations and citation omitted); *see also M.H. v. N.Y. City Dep't of Educ.*, 685 F.3d 217, 224; *A.C. v. Bd. of Educ. of Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 173 (2d Cir. 2009).  If the IEP is not substantively adequate, the parent is automatically entitled to tuition reimbursement.  *R.E.*, 694 F.3d at 190.  If, on the other hand, the school district is found to have offered the student a FAPE, then "the necessary inquiry is at an end" and the second and third prongs of the *Burlington/Carter* test need not be considered.  *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 66 (2d Cir. 2000).

Plaintiffs' arguments in this Court implicate the first *Burlington/Carter* prong.  First, Plaintiffs argue that L.M.'s 2011-12 IEP was procedurally inadequate because it failed to include

a complete transition plan as required under applicable education laws.  Second, Plaintiffs

challenge the appropriateness of DOE's proposed placement of L.M. at Hungerford.  *See*

*generally* Pls. Mem.

### A.  The IEP's Failure to Include a Complete Transition Plan Did Not Result in Denial of a FAPE

Plaintiffs argue that the Defendant failed to provide L.M. with a FAPE for the 2011-12

school year because her IEP was procedurally defective in failing to provide a comprehensive

"transition plan" as required under applicable law.[8]  Pls. Mem. at 11-15.  In particular, Plaintiffs

argue that: (1) the transitional goals and objectives provided in L.M.'s IEP were too generic and

vague, and no specific activities were included, *id.* at 12-14 (citations omitted); (2) the IEP's

transition plan was less detailed and tailored than the plan and activities provided in L.M.'s

Rebecca reports, *id.* at 13-15 (citations omitted); (3) L.M. was not interviewed before the IEP

was prepared,[9] *id.* at 12; and (4) the DOE failed to conduct a vocational assessment in connection

with the IEP,[10] *id.* (citations omitted).  Plaintiffs further argue that, in finding that these alleged

deficiencies resulted in L.M. being deprived of a FAPE, the IHO's decision was more carefully

---

[8]      The IDEA requires that appropriate measureable post-secondary goals and related services, based upon age appropriate transition assessments related to training, education, employment, and, if appropriate, independent living skills, be included in IEPs for students sixteen years old or older.  20 U.S.C. § 1414(d)(1)(A)(VIII); 34 C.F.R. §300.320(b).  State regulations provide similar requirements for students who are at least fifteen years old.  8 NYCRR § 200.4(d)(2)(ix).  Because L.M. turned fifteen during the 2011-12 school year, her argument is based only on state regulations.

[9]      The record makes clear that L.M. was invited to participate in the CSE meeting, but she did not choose to attend.  Tr. 60; Def. Ex. 3.  Plaintiffs do not point to any case law or other legal authority for the proposition that a student is required to attend a CSE meeting or that her failure to do so renders the IEP legally insufficient.

[10]     Plaintiffs point to no legal authority to support their argument that a vocational assessment must be performed prior to the creation of an IEP transition plan for a student who will turn fifteen or older during the applicable school year.  *Cf. Scott ex rel. C.S. v. N.Y. City Dep't of Educ.*, 6 F. Supp. 3d 424, 438 (S.D.N.Y. 2014) (rejecting argument that the DOE's failure to conduct a transitional or vocational assessment rendered the IEP legally inadequate (citations omitted)).  In any event, the record reflects that a vocational assessment would have been conducted had L.M. enrolled at Hungerford.  Tr. 60, 110.

considered and better reasoned than the decision of the SRO, and therefore the Court should

defer to the IHO's Decision, rather than the SRO's Decision.  Pls. Mem. at 15.

     While Plaintiffs correctly highlight ways in which the IEP transition plan could have

been improved, or in some cases, ways in which the transition plan was plainly inadequate under

applicable regulations, they ultimately fail to show how these shortcoming resulted in L.M. being

deprived of a FAPE.  It is well established that "[n]ot every procedural error will render an IEP

legally inadequate."  *M.Z. v. N.Y. City Dep't of Educ.,* No. 12 CIV. 4111(KBF), 2013 WL

1314992, at *5 (S.D.N.Y. Mar. 21, 2013) (citing *R.E.*, 694 F.3d at 188).  Instead, relief is only

warranted if the alleged deficiencies "'impeded the child's right to a free appropriate public

education,' 'significantly impeded the parents' opportunity to participate in the decisionmaking

process,' or 'caused a deprivation of educational benefits.'"  *C.F.*, 746 F.3d at 78-79 (quoting 20

U.S.C. § 1415(f)(3)(E)(ii)).

     Here, the Court finds that the SRO's conclusion, that the deficiencies in L.M.'s transition

plan did not result in her being denied a FAPE, is well-reasoned and supported by the record;

therefore, the SRO's conclusion is entitled to deference.  *See, e.g.*, *C.L.*, 744 F.3d at 838 (courts

should generally defer to the SRO over the IHO unless the SRO's decision is insufficiently

reasoned and the IHO's decision is more carefully considered).  While conceding that the

transition plan failed to comply with the applicable legal requirements, *see* Second SRO

Decision at 7 ("[T]he fact remains that the district did not provide for an appropriate transition

plan"), the SRO examined the IEP as a whole and found that the deficiencies did not impede

L.M.'s parents' ability to participate in the decision-making process or deprive L.M. of

educational benefits or a FAPE, *id.* at 7-8.

     In so concluding, the SRO noted that the IEP included four post-secondary goals

(independently integrating into the community, exploring vocational and educational services,

living independently and seeking employment), all of which aligned with the goals discussed by L.M.'s parents and teachers at her CSE meeting. *Id.* at 7 (citing Def. Ex. 3 at 16). Although the "Transition" portion of the IEP did not identify specific activities and services that would be delivered to help L.M. achieve these goals (as it should have), other aspects of the IEP made up for this deficiency. *Id.* at 7-8. In particular, the IEP included annual goals and short-term objectives, such as improving L.M.'s ADL skills (by, for example, creating and managing a budget, and learning to travel independently), developing her language skills and problem solving through participation in school and community events, and implementing coping strategies when she was "dysregulated." *Id.* The SRO specifically found that these and other skills would "assist the student's achievement of [her] postsecondary goals of seeking employment, living independently, and integrating into the community." *Id.* In contrast, the IHO did not evaluate the deficiencies in the transition plan in the context of the IEP as a whole, instead concluding, in a conclusory manner, that "the failure of the IEP to comply with [applicable regulations] . . . impeded LM's right to a FAPE and caused LM to be deprived of educational benefits." Second IHO Decision at 9-10.

Because the SRO's decision was well-reasoned, supported by the record and considered the IEP as a whole, while the IHO only viewed the transition plan in isolation, the Court defers to the SRO; any deficiencies in L.M.'s transition plan did not result in the denial of a FAPE and the IEP was "reasonably calculated to enable [L.M.] to receive educational benefits." Second SRO Decision at 8 (quoting *Rowley*, 458 U.S. at 206-207 (other citations omitted)); *see also Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 382 (2d Cir. 2003) ("[W]hether a procedural or a substantive issue[,] the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers."); *A.D. v. N.Y. City Dep't of Educ.*, No. 12 CIV. 2673(RA), 2013 WL 1155570, at *11 (S.D.N.Y. Mar. 19,

2013) ("[T]he transition plan, though sparse, does not invalidate the IEP or amount to a denial of a FAPE." (citations omitted)); *M.Z.*, 2013 WL 1314992, at *9 ("The deficiencies identified by the SRO . . . did not deny the Student a FAPE when viewed in the context of the IEP as a whole" (citing *See Karl ex rel. Karl v. Bd. of Educ.*, 736 F.2d 873, 877 (2d Cir. 1984) (district courts should evaluate the IEP as a whole rather than scrutinizing component parts in isolation))); *J.M. I*, 2013 WL 5951436, at *17 (finding L.M.'s 2011-12 IEP to be substantively adequate).

### B.  Hungerford Was Presumptively Capable of Fulfilling the IEP

#### 1.  Legal Framework

The Second Circuit in *M.O.* made clear that "*R.E.* does not foreclose *all* prospective challenges to a child's proposed placement school" but instead "stands for the unremarkable proposition that challenges to a school district's proposed placement school must be evaluated prospectively (*i.e.*, at 'the time of the parents' placement decision') and cannot be based on mere speculation." *M.O.*, 793 F.3d at 244 (citing *R.E.*, 694 F.3d at 195) (emphasis in original).  The Second Circuit further specified what constitutes a permissible challenge: "[w]hile it is speculative to conclude that a school with the capacity to implement a given student's IEP will simply fail to adhere to that plan's mandates, it is not speculative to find that an IEP cannot be implemented at a proposed school that lacks the services required by the IEP." *M.O.*, 793 F.3d at 244 (citations omitted).[11]  The Second Circuit provided two examples of non-speculative

---

[11]     District courts that have subsequently examined *M.O.* have rephrased this distinction.  One court distinguished "between conclusory claims that the school simply *would not* implement an IEP and claims that the school *could not* implement an IEP," *W.W. & D.C. v. N.Y. City Dep't of Educ.*, No. 14 CIV. 9495(PAC), 2016 WL 502025, at *6 (S.D.N.Y. Feb. 8, 2016) (emphasis in original).  Another distinguished "between deciding that a placement was inappropriate because 'a school with the capacity to implement a given student's IEP will simply fail to adhere to that plan's mandates . . . ' and finding that the placement was inappropriate because 'a proposed school lacks the services required by the IEP.'" *GB v. N.Y. City Dep't of Educ.*, No. 14 CIV. 9951(CM), 2015 WL 7351582, at *17 (S.D.N.Y. Nov. 5, 2015) (quoting *M.O.*, 793 F.3d at 244).  These courts found that reaching the former conclusion was "speculative" when the student had not enrolled in the school, but the latter conclusion was non-speculative.

challenges: (1) a proposed placement that was not seafood-free could not implement an IEP recommending a seafood-free environment for a child with a life threatening seafood allergy, *M.O.*, 793 F.3d at 244 (citing *D.C. ex. rel. E.B. v. N.Y. City Dep't of Educ.*, 950 F. Supp. 2d 494, 513 (S.D.N.Y. 2013)); and (2) a proposed school that provided only in-class occupational therapy in a group setting could not implement an IEP recommending one-on-one occupational therapy outside of the classroom, *M.O.*, 793 F.3d at 244 (citing *B.R. ex. Rel. K.O. v. N.Y. City Dep't of Educ.*, 910 F. Supp. 2d 670, 676-79 (2d Cir. 2012)).

If there is an adequate IEP, there will be few circumstances in which a parent can successfully challenge a placement if their child never attended the school, because mere "[s]peculation that the school district will not adequately adhere to the IEP is not an appropriate basis for unilateral placement."  *R.E.*, 694 F.3d at 195; *see also T.F. v. N.Y. City Dep't of Educ.*, No. 14CV3401, 2015 WL 5610769, at *7 (S.D.N.Y. Sept. 23, 2015), *appeal withdrawn*, (Jan. 12, 2016).  Similarly, a substantive attack on a child's IEP that is couched as a challenge to the adequacy of the proposed placement is also not a permissible challenge—those types of challenges do not relate to the placement's capacity to implement the IEP but to the appropriateness of the IEP's substantive recommendations, which must be determined by reference to the written IEP itself.  *M.O.*, 793 F.3d at 245 (citing *R.E.*, 694 F.3d at 187).

*M.O.* also clarifies who bears the burden of showing that the proposed placement has the capacity to implement the student's IEP.  If a student's IEP is substantively adequate, it is incumbent upon the parents to adduce some evidence that the school could not or would not have adhered to the IEP.  *See M.O.*, 793 F.3d at 245-46; *see also N.S. v. N.Y. City Dep't of Educ.*, No. 13-CV-7819(VEC), 2014 WL 2722967, at *13 (S.D.N.Y. June 16, 2014) (holding that the school district discharges its initial burden of proof by establishing that a student's IEP is substantively adequate, and then the parents must establish that the school district would not have adhered to

the written plan).  Although the school district bears the ultimate burden of persuasion that the placement is appropriate, absent a challenge based on non-speculative evidence available at the time the parents opted out of the placement, "the school district [is] not required to present evidence regarding the adequacy of [the recommended placement] at the impartial hearing." *M.O.*, 793 F.3d at 246.[12]

## 2.  Standard of Review

The parties do not specifically address the level of deference to be afforded to the IHO's and SRO's respective Decisions regarding the appropriateness of the Hungerford placement. The Court notes, however, that in determining that Hungerford was not suitable for L.M., the IHO: failed to determine whether Plaintiffs had raised any permissible prospective challenges; based her conclusion on arguments that Plaintiffs did not raise in the DPC;[13] and analyzed the pertinent facts in ways that were, at times, inconsistent.[14]  In contrast, although the SRO relied,

---

[12]     In *W.W.*, Judge Crotty held: "the school district bears the burden of showing that the proposed placement school has the capacity to implement the child's IEP.  The Court notes that this is not an explicit holding [of *M.O.*] but rather a necessary inference." *W.W.*, 2016 WL 502025, at *7 (internal citation omitted).  Judge Crotty acknowledged that the school district's obligation arose only in the face of a prospective challenge to the school's capacity to implement the IEP based on "nonspeculative evidence" that was available at the time the parents opted out of the district's placement. *Id.* at *7, n.7.  "Such evidence may be used to rebut the school district's evidence, but that evidence is not required to raise a prospective challenge in a due process complaint." *Id.* at *7.  It is not entirely clear whether Judge Crotty was discussing the pleading requirements of a DPC or holding that, in the face of a valid challenge articulated in a DPC, the school district has the obligation in the first instance to present evidence that the district can comply with the IEP at the proposed placement site.  In any event, *W.W.* did not hold that, even absent a presumptively valid challenge to the placement, the district nonetheless has the burden of producing evidence before the IHO that the district can and will comply with the IEP at the recommended placement.

[13]     For example, Plaintiffs' DPC made no mention of Hungerford's bells or the socializing time that L.M. allegedly would miss if she chose to eat in the private cafeteria, while those considerations factored significantly in the IHO's conclusion that Hungerford was an inappropriate placement. *Compare* Pls. Ex. A *with* Second IHO Decision at 15-16.

[14]     For example, the IHO determined that Hungerford was inappropriate because it "was not an environment designed to address [L.M.'s] auditory stimulus issues, specifically her sensitivity to noise," while basing that determination, in significant part, on the unsupported conclusion that Hungerford's private (and undisputedly quiet) cafeteria would have deprived L.M. of "the socialization that takes place during mealtimes."  Second IHO Decision at 16.  Meanwhile the record confirms that L.M. would have been eating in the private cafeteria with at least two other students, therefore calling into question the IHO's seemingly nonresponsive finding that L.M. would have been unable to socialize during meals.  Tr. 129, 131.

in part, on an overly broad view of the Second Circuit's decision in *R.E.*, which has since been

clarified by its decision in *M.O.*,[15] he reviewed the record and provided a thorough and well-

reasoned explanation for his finding that the parents had raised no non-speculative claims to

support their assertion that Hungerford "would have deviated from [L.M.'s] IEP in a material or

substantial way."  Second SRO Decision at 9 (citations omitted).  The Court therefore finds that

the SRO's Decision is entitled to deference to the extent it analyzes Plaintiffs' challenges in the

context of the IEP's mandates.  Nevertheless, because the permissibility of Plaintiffs' prospective

challenges is an issue of law, the Court considers their objections *de novo*.  *Cf. M.O. v. N.Y. City

Dep't of Educ.*, 996 F. Supp. 2d 269, 271 (S.D.N.Y. 2014) (reviewing *de novo*, as an issue of

law, whether a certain type of evidence is required for DOE to meet its burden of proof, *aff'd*,

793 F.3d 236 (2d Cir. 2015)).

### 3.   Plaintiffs Fail to Raise a Non-Speculative Claim that Hungerford Could Not or Would Not Implement the IEP

As previously discussed, despite its procedural deficiencies, L.M.'s 2011-12 IEP was

substantively adequate.  Therefore, in order to challenge the placement, Plaintiffs must raise a

non-speculative claim that the proposed placement would not have adhered to the IEP.  *R.E.*, 694

F.3d at 195; *B.K.*, 12 F. Supp. 3d at 370-72.

Plaintiffs argue before this Court that Hungerford was not an appropriate placement for

L.M. for the reasons articulated by the IHO, namely: (1) Hungerford was too large; (2) the

---

[15]      The parties do not accurately describe the Second Circuit's holding in *M.O.*.  Specifically, Defendant
suggest that *M.O.* absolutely precludes parents from challenging a proposed placement that their child has yet to
attend.  Defs. Mem. at 27-28.  The determinative factor in *M.O.* is not, as Defendants suggest, whether the student
actually attended the school, but rather whether the school "lacks the services required by the IEP."  793 F.3d at 244;
*see also N.S.*, 2014 WL 2722967, at *12 ("[I]f a school is factually incapable of providing a FAPE to a student, the
student's parents need not subject their child to that placement.").  And, while Plaintiffs identify the relevant issue as
"whether the placement could implement the IEP as written," Pls. Mem. at 21, they improperly attempt to
characterize their challenges as deficiencies pertinent to Hungerford, when relevant case law construes them,
instead, as improper challenges to the IEP.  *Id.* (arguing that "the placement could not appropriately implement the
IEP or provide the child with a free appropriate public education because of factors inherent in the school").

school bells and cafeteria noise would not be appropriate given L.M.'s auditory sensitivity; and (3) if L.M. opted to eat in the quiet "private" cafeteria, she would miss valuable socialization time.  Pls. Mem. at 15-17 (citing Second IHO Decision at 15-16).  Plaintiffs argue that Hungerford was "incapable" of "meet[ing] [L.M.'s] auditory input sensitivity needs," because "[t]he size of the school, the bells, the location of the lunchroom, and the loss of instructional time were all established fixed parts of the program at Hungerford."  Pls. Mem. at 24 (citing Second IHO Decision at 16).

The Court disagrees.  Plaintiffs' objections to Hungerford are exactly the type of objection that is foreclosed by *R.E.* and *M.O.*  These objections are either based on Plaintiffs' subjective belief that the school would have been inappropriate or are, in actuality, substantive attacks on the adequacy of the IEP couched as challenges to the placement.

Setting aside the fact that only about 60 students attend Hungerford and that the evidence shows that the Hungerford wing is largely self-contained within the larger building that it shares with other schools, Plaintiffs' complaint that the school is too large is an impermissible challenge because it does not relate to whether the school could implement the IEP.  While the IEP requires that L.M. be placed in a classroom with a 6:1:1 teaching ratio, it makes no mention of the size of school that L.M. must attend, whether with respect to the physical building or with respect to the number of other students in the school.  *See M.O.*, 793 F.3d at 245 (holding that an objection that recommended placement was inappropriate because the parent said that the child would "shut down completely" if placed there is a subjective concern that does not demonstrate the school lacked IEP-mandated services).  The Court does not minimize Plaintiffs' concerns about L.M.'s ability to thrive in the large school building that Hungerford shares with three other schools, but this objection does not justify L.M.'s unilateral placement because it does not relate to Hungerford's capacity to implement IEP-mandated services.  *See Y.F. v. N.Y. City Dep't of*

19

*Educ.*, No. 15 CIV. 6322(LGS), 2015 WL 4622500, at *7 (S.D.N.Y. July 31, 2015) (holding that

plaintiffs' arguments about the proposed placement, ranging from its size, to its curriculum, to its

environment, are not contrary to any specific requirement in the IEP and are impermissibly

speculative arguments that are really substantive attacks on the IEP); *S.E. v. N.Y. City Dep't of

Educ.*, 113 F. Supp. 3d 695, 710 (S.D.N.Y. 2015) (holding that plaintiff could not successfully

challenge a placement by arguing that the school's self-contained 6:1:1 classroom did not

conform with the IEP because it did not allow for the child to interact with typically-developing

peers when social interaction with typically-developing children was not mandated in the IEP).

Plaintiffs also contend that Hungerford was an inappropriate placement because the bells

and loud cafeteria noise would not be suitable given L.M.'s auditory sensitivities.  With respect

to Hungerford's bells, that issue was not raised in the DPC and is, therefore, waived.[16]  This

Court believes that permitting school placement challenges to be advanced for the first time in

the district court effectively eliminates the exhaustion requirement and undercuts the utility of an

---

[16]     There is disagreement in this Circuit whether failure to raise a claim in the DPC waives the claim.
*Compare M.O.*, 996 F. Supp. 2d at 271 ("Plaintiffs argue that the IEP was inadequate due to a variety of defects,
most of which were not specifically raised before the state hearing officers and thus are not appropriate for review at
this stage." (internal citations omitted)); *and A.M. ex rel. Y.N. v. N.Y. City Dep't of Educ.*, 964 F. Supp. 2d 270, 282-
83 (S.D.N.Y. 2013) (holding that a failure to include a challenge to the appropriateness of a recommendation in a
due process complaint normally precludes consideration of the claim by the IHO and SRO, as well as the court
reviewing those decisions); *and B.M. v. N.Y. City Dep't of Educ.*, No. 12-cv-3247(JMF), 2013 WL 1972144, at *7
n.2 (S.D.N.Y. May 14, 2013) ("The fact that a court may consider new *evidence*, however, does not mean that it
may consider a new *argument* or *claim*." (emphasis in original)), *aff'd*, 569 F. App'x 57 (2d Cir. 2014); *and B.P. v.
N.Y. City Dep't of Educ.*, 841 F. Supp. 2d 605, 611 (E.D.N.Y. 2012) ("The scope of the inquiry of the IHO, and
therefore the SRO and this Court, is limited to matters either raised in the Plaintiffs' impartial hearing request or
agreed to by Defendant.") *with M.P.G. ex rel. J.P. v. N.Y. City Dep't of Educ.*, No. 08-cv-8051(TPG), 2010 WL
3398256, at *8 (S.D.N.Y. Aug. 27, 2010) ("[T]here is arguably no reason that issues not raised in IDEA
administrative proceedings may not be raised on appeal to the district court since, by statute, the district court's
review may include the consideration of additional evidence." (citing *Arlington Cent. Sch. Dist. v. D.K. and K.K.*,
No. 02-cv-2117 (DLC), 2002 WL 31521158, at *9 (S.D.N.Y. Nov. 14, 2002))) *and P.G. v. N.Y. City Dep't of Educ.*,
959 F. Supp. 2d 499, 509-10 (S.D.N.Y. 2013) (concluding that the DOE "opened the door" to an issue regarding the
appropriateness of an IEP's 12:1:1 recommendation, which the parents would have otherwise waived, "when it
raised the issue in its opening argument and elicited testimony about it from one of its witnesses on direct
examination." (citing *M.H.*, 685 F.3d at 250-51)).

administrative process.[17]  Because Plaintiffs did not raise in their DPC any issue relating to

Hungerford's bells, the DOE did not have fair notice of this claim and the argument was

waived.[18]

Even if the Court were to consider Plaintiffs' argument regarding Hungerford's bells,

both that challenge and Plaintiffs' challenge relative to the noise in Hungerford's cafeteria are

impermissibly speculative because they do not relate to whether Hungerford could implement

L.M.'s IEP.  L.M.'s IEP mandated that she be provided "access to a quiet environment during

the school day," Second SRO Decision at 9 (citing Def. Ex. 3 at 17), but it did not mandate that

the entire school be quiet at all times.  The record reflects that Hungerford followed a different

schedule than the other schools in the building, Hungerford students did not hear the bells of the

other schools or interact with other students during passing periods, Hungerford students who do

not tolerate loud noise had access to a private cafeteria during meal times, and Hungerford

classrooms were fitted with certain noise-reducing materials.  Second SRO Decision at 9

(citations omitted).  Because the record indicates that Hungerford, notwithstanding the bells and

the noisy lunchroom, was able to provide L.M. with access to a "quiet environment" as required

by her IEP, the Court finds these challenges to be impermissibly speculative.

---

[17]  Although the Court recognizes that the Second Circuit has not definitively decided the issue, it finds instructive the Second Circuit's recent discussion in *B.P. v. N.Y. City Dep't of Educ.*, No. 15-16-CV, 2015 WL 9487873, at *3 (2d Cir. Dec. 30, 2015) (summary order).  There, the Second Circuit found no error in a district court's decision not to address claims that plaintiffs did not raise in their due process complaint.  *Id.*  The Second Circuit reasoned that "[t]he due process complaint serves as fair notice to the school district, and gives the district 30 days to resolve the complaint to the parents' satisfaction before a hearing."  *Id.*

[18]  The discussion of waiver in *B.P.* is further supported by a long line of cases requiring administrative exhaustion of all claims brought under, or potentially brought under, the IDEA.  *See, e.g.*, *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 245-46 (2d Cir. 2008) ("Failure to exhaust the administrative remedies deprives the court of subject matter jurisdiction.  The purpose of the exhaustion rule is to channel disputes related to the education of disabled children into an administrative process that could apply administrators' expertise in the area and promptly resolve grievances." (internal quotations and citations omitted)); *Heldman on behalf of T.H. v. Sobol*, 962 F.2d 148, 159 (2d Cir. 1992) ("The exhaustion doctrine prevents courts from undermining the administrative process and permits an agency to bring its expertise to bear on a problem as well as to correct its own mistakes."); *A.M.*, 964 F. Supp. 2d at 283 (collecting cases).

Finally, Plaintiffs argue that, if L.M. ate in the private cafeteria (in order to avoid the noisy atmosphere of the larger cafeteria), she would miss out on valuable socialization time.  Pls. Mem. at 16.  As with Plaintiffs' challenge regarding Hungerford's bells, their challenge regarding social time during meals was not raised in the DPC but instead was raised *sua sponte* by the IHO.  For the reasons discussed *supra*, that argument is therefore waived.  But even if it were not waived, Plaintiffs' challenge regarding socialization time is, like their other arguments, impermissibly speculative because the IEP did not require L.M. to socialize at all times or specifically during mealtimes.[19]  Therefore, as the SRO found, there is no evidence that the Hungerford placement "would have deviated from [L.M.'s] IEP in a material or substantial way."  Second SRO Decision at 9 (citations omitted).

Because the Court concludes that the DOE offered L.M. a FAPE, the Court does not reach the second or third prongs of *Burlington/Carter* regarding the appropriateness of Rebecca as a placement or whether the equities favor reimbursement.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED. Defendant's cross-motion for summary judgment is GRANTED.  The Clerk of the Court is directed to enter judgment for Defendant, to terminate Dkts. 14 and 16, and to terminate the case.

SO ORDERED.

Date:  **March 21, 2016**
       **New York, New York**

**VALERIE CAPRONI**
**United States District Judge**

---

[19]     Moreover, the record reflects that even if L.M. chose to eat in the quiet dining room, there would be at least two other students with her. Tr. 129, 131.  While a table of three might not be as social as a large (and noisy) lunch room table, she would not be deprived of all ability to socialize during meals.

# APPENDIX

| Acronym | Stands for |
|---------|-----------|
| CSE | Committee on Special Education |
| DOE | Department of Education |
| DPC | Due Process Complaint |
| FAPE | Free Appropriate Public Education |
| FNR | Final Notice of Recommendation |
| IDEA | Individuals with Disabilities Education Act |
| IEP | Individualized Education Program |
| IHO | Impartial Hearing Officer |
| NYCRR | New York Compilation Codes, Rules and Regulations |
| J.M. | L.M.'s parent |
| N.M. | L.M.'s parent |
| L.M. | The child with a disability seeking reimbursement for her private school tuition |
| SRO | State Review Officer |